# EXHIBIT A

E-FILED
1/31/2022 1:36 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
22CV393988
Reviewed By: M. Dominguez

David Markevitch (SBN: 256163)
Damion Robinson (SBN: 262573)
Adeline Black (SBN: 341511)
Affeld Grivakes LLP
1261 Lincoln Avenue, Suite 208
San Jose, CA 95125
408-463-6802 (tel)
408-503-0889 (fax)
dm@agzlaw.com

Attorneys for Plaintiff

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

**UNLIMITED CIVIL**

| | |
|---|---|
| LAN FENG, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>ASC THERAPEUTICS, INC., a Delaware corporation, and DOES 1-50, inclusive,<br><br>Defendants. | Case No.: 22CV393988<br><br>**COMPLAINT FOR:**<br><br>**(1) WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**<br><br>**(2) RETALIATION IN VIOLATION OF LABOR CODE § 1102.5**<br><br>**(3) VIOLATION OF 31 U.S.C. § 3730 (FEDERAL FALSE CLAIMS ACT RETALIATION)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff LAN FENG, demanding trial by jury of all issues joined herein, alleges as follows:

**INTRODUCTION**

1. In November 2020, Plaintiff Lan Feng ("Feng" or "Plaintiff") was hired by ASC Therapeutics, Inc. (collectively with Doe Defendants as "Defendants") to serve as their VP of Quality. Defendants produce and develop products used in gene and cell therapy, so safety is of paramount importance.

1

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

2. Soon after Feng began work, she became aware of various safety concerns and instances of non-compliance within the company. These included, but were not limited to, the Director of Chemistry, Manufacturing, and Control's lack of qualifications, improper protocols by vendors, and contamination of Defendants' products, which they did not report to relevant agencies as required.

3. Feng repeatedly reported her concerns to her supervisors and to the company's Human Resources department. She was ignored and her complaints were dismissed on each occasion.

4. Eventually, tensions came to a head. Feng was improperly placed on Defendants' Performance Improvement Program ("PIP"), a disciplinary/corrective action, as a direct result of the fact that she had continued reporting compliance issues, as her job required.

5. On September 3, 2021, Feng was given an ultimatum: accept the terms of the PIP or be terminated. When she refused to concede to the unwarranted punishment, Feng was terminated.

**PARTIES**

6. Plaintiff Lan Feng ("Feng" or "Plaintiff") is, and at all times mentioned herein was, a resident of the County of Santa Clara, California and was an employee of Defendants ASC Therapeutics, Inc. ("ASC"), and Does 1-50, inclusive (collectively "Defendants" or "the company").

7. Plaintiff alleges on information and belief that Defendants are corporations and/or individuals authorized to do business, employing individuals in and existing under the laws of the State of California. ASC is a fully incorporated biopharmaceutical company focusing on the development of curative therapeutic products using gene-editing technology.

8. Plaintiff is ignorant of the true names and/or capacities of the defendants sued herein as Does 1-50, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend the Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named

defendants is legally responsible for the occurrences herein alleged and that Plaintiff's losses and damages are the result of their wrongful conduct.

9. Plaintiff is informed and believes and thereon alleges that at all relevant times herein, all Defendants and Does 1-50 were the agents, joint employers, alter egos, and/or joint ventures of, or working in concert with the other Defendants, and were acting within the course and scope of such agency, employment, joint venture and/or concerted activity. To the extent that said conduct and/or omissions were perpetrated by Defendants and their agents, Defendants confirmed and ratified said conduct and/or omissions.

## JURISDICTION AND VENUE

10. The monetary value of Plaintiff's claims exceeds $25,000.

11. The amount in controversy herein is within the jurisdiction of this Court.

12. Defendant ASC Therapeutics, Inc. is a Delaware corporation authorized to do and doing business within the state of California. Its California headquarters are located at 521 Cottonwood Drive, Suite 111, Milpitas, CA 95035, County of Santa Clara.

13. Plaintiff alleges on information and belief that Does 1-50 were and are California corporations or other business entities or individuals authorized to do and who did business in the County of Santa Clara.

14. The acts, omissions, damages, and injuries that form the basis of this lawsuit were sustained in the County of Santa Clara.

## FACTUAL ALLEGATIONS

15. Defendant ASC Therapeutics, Inc. ("ASC") is a biopharmaceutical company specializing in development of products for use in gene therapy and cell therapy. It has two products in clinical stage – ASC618 and ASC930.

16. On October 23, 2020, ASC Therapeutics, Inc. offered Feng the position of VP of Quality. Feng's first day of work was November 16, 2020.

17. As Head of Quality, one of Feng's primary responsibilities was to ensure that the internal and external activities of the company and its employees were in compliance with all relevant CFR (Code of Federal Regulations) and FDA regulations, including GMP (Good

Manufacturing Practice) Regulations.  She was further responsible for creating, reviewing, and approving the company's internal SOPs (Standard Operating Procedures) related to such compliance, overseeing the GMP activities, and reviewing the internal and external documents and records to ensure compliance and data integrity.

18. Soon after she started working, Feng observed that Lijing Li ("Li"), the Director of CMC (Chemistry, Manufacturing, and Control), lacked the proper personnel qualifications as required by the FDA's GMP for Finished Pharmaceuticals.  Specifically, amongst other issues, Li was in violation of 21 CFR 211.25(b).  This subsection stipulates that people involved in product manufacturing and processing should possess adequate, sufficient, and relevant education, training, and experiences, including familiarity with GMP regulations and quality.

19. Li's lack of competence was demonstrated on multiple occasions. For example, she failed to provide critical records, including documents of the products' information, to Feng, ASC's Quality Head.  This constituted another CFR violation; 21 CFR 211.192 requires all drug production and control records to be reviewed for compliance and approved by the QA unit.  Furthermore, Li unilaterally made changes to specifications and processes without consulting Feng/QA, and without their approval, in clear violation of CFR stipulations and the company's own internal procedures.  For pharmaceutical drugs intended for use in humans, any and all changes in the manufacturing processes and quality specifications must be made pursuant to applicable laws and regulations, including the GMP.  For example, 21 CFR 211.100 explicitly states that any changes to product production or process control procedures must be reviewed and approved by an independent QA unit.

20. Feng began confronting Li about the aforementioned and other non-compliance issues in December 2020.  Li's general response was that she made all executive decisions by herself before Feng joined the company, and that QA was only slowing down the company's projects.

21. On December 11, 2020, Feng had a conversation with Ruhong Jiang, President and CEO of ASC Therapeutics.  In it, she voiced her concern about various non-compliance

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

issues related to Li (not sharing required data records or GMP manufacturing activities with QA, keeping QA out of the loop on critical decisions, not exhibiting proper understanding of relevant external and internal regulations, etc.).  Feng expressed similar concerns in further conversations with Mr. Jiang on December 15 and December 27.  In yet another conversation on January 12, 2021, Mr. Jiang acknowledged that Li did not share information with other people, including with her own consultant.

22. On February 3, 2021, in a phone conversation with Mr. Jiang, Feng reported another GMP violation by Li.  Namely, that the latter changed a specification without QA's approval.

23. On February 5, 2021, Feng found out that one of ASC's vendors for the tissue cell sources for ASC930, was not qualified per ASC's internal procedures and per 21 CFR 1271.  The FDA enforces Good Tissue Practices (GTP) through the latter.  The vendor did not provide a donor eligibility statement in a timely manner, and thus did not meet the relevant 21 CFR 1271 requirements.  Additional vendor activities went against the GTP provisions as well.

24. On February 8, 2021, during a senior leadership team (SLT) meeting, Feng raised her serious concerns about the vendor's lack of qualifications, the donor eligibility issues that violated 21 CFR 127, and other related issues.  But she was ignored.

25. Around March 2021, Feng had a meeting with Mr. Jiang.  During the meeting, Mr. Jiang acknowledged that he had recently learned of Li's limited experience with GMP and the compliance issues in general.

26. On March 7, 2021, Feng confronted Li in a phone conversation regarding the noncompliance issues by another vendor, Vigene.  Li responded by saying "I am reporting to CEO, not you," and hung up the phone.  Feng emailed Mr. Jiang, again complaining of Li's non-compliance with GMP regulations.

27. On March 8, 2021, Feng had a one-on-one meeting with Mr. Jiang.  She emphasized the need for QA to be able to make independent decisions, especially in light of Li's non-compliance with regulations and internal/external SOPs.  Mr. Jiang did not offer a solution to the issues raised.

COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

28. On April 6, 2021, Feng reported another GMP violation via email to Mr. Jiang. She expressed concerns that the violations were willful and not simply due to lack of knowledge. Mr. Jiang emailed Li that same day, asking her to "work closely with the quality head." However, Li continued to commit violations and disregard Feng's role and duties. Feng continued to relay her concerns to the company and continued to be ignored.

29. In fact, despite the numerous warnings Feng provided about Li's obvious and repeated breaches of regulations and external/internal procedures, Li was promoted to a Senior Director position on August 1, 2021. Based on this development and other feedback that Feng had received, she realized that the company and its CEO favored project expediency and future profits prospects over compliance and, ultimately, over patients' safety. This was further corroborated by the facts discussed below.

30. During the period between January and May 2021, two separate contamination events occurred that affected ASC618. Li was unable to handle those issues and refused to take responsibility as a project lead. On May 7, 2021, Feng presented the ASC618 and ASC930 production lots' status from an QA point of view in an SLT meeting, emphasizing the need for coordination with Contract Manufacturing Organizations (CMOs) on clinical trial materials production matters. ASC set up a Task Force Team which, among other things, had to educate Li on her duties and responsibilities during a May 17, 2021 meeting.

31. In a clear violation of federal regulations, ASC, through its SLT, chose not to report the contamination incidents to the FDA. Specifically, ASC misled the FDA in its IND (Investigational New Drug) application by not updating/reporting the contamination issues in its clinical materials. This decision was made despite the fact that ASC was aware of a CMO conclusion that the same bacteria contaminated two separate GMP batches as identified in the plasmid materials. By doing so, it violated the provisions of CPG (Compliance Policy Guide) Sec. 120.100, as this conduct constituted an "untrue statement of material facts" as defined by the related FDA's AIP (Application Integrity Policy).

32. On July 5, 2021, the FDA, oblivious to the blatant violations present in the IND application, authorized ASC to use ASC618 for first-in-human clinical testing. In hearing that

news, Mr. Jiang said in an SLT meeting that the value of the company could increase tenfold should it obtain the first-in-human data.

33. On or around July 17, 2021, ASC also applied for and was granted a Drug Manufacturing License (License Number: 113832) by the State of California Department of Public Health Food and Drug Branch.  On information and belief, this license was obtained by ASC's failure to report its contamination incidents, as well as their failure to disclose their noncompliance with regulations such as California Health and Safety Code §§ 111630, 111635, and 111640.  These regulations are meant to ensure the accuracy of licensing application and permit inspections of drug-manufacturing facilities.

34. Following the February 2021 SLT meeting, up until her termination, Feng insisted on reviewing the raw data related to the company's IND application for ASC618.  This fell firmly within the scope of her duties. She was once again ignored by SLT, when she expressed her concerns about moving forward despite known contamination.

35. On August 5, 2021, Feng emailed Mr. Jiang regarding yet another instance of Li's non-compliance.  Li kicked Feng out of an email group in which Feng's role obligated her to be included.  Li denied this act, despite the evidence to the contrary.

36. On August 6, 2021, during a SLT meeting (with Mr. Jiang and Li present), Feng again raised her non-compliance concerns.  The implications were of great import: based on the gravity of the non-compliance issues, ASC618 would likely be rejected for use in human trials, despite the recent FDA approval.  Li responded this was the first time she heard there were non-compliance issues, a statement which was misleading at best.  Mr. Jiang suggested that they work together to resolve the issues. Later that day, in response to Li's email from the prior day, he also suggested "a face-to-face meeting with [Li] to train her on GMP compliance relevant issues."

37. On August 8, 2021, Feng called Mr. Jiang to inquire whether he had been conveying her concerns to Li.  While Mr. Jiang stated that he had, Feng was doubtful about the veracity of his assurances.

38. On August 9, 2021, Feng emailed Mr. Jiang, SLT members, and Nan Sheng in HR about Li's unilateral decision to invite external Contract Manufacturing Organizations to discuss compliance issues following the August 6th SLT meeting, as the compliance issues that needed addressing were internal (i.e., Li's).

39. Later that day, Feng sent an email to HR (Nan Sheng) complaining of "workplace coercion and harassment." In this email, she noted Li's bullying and lies related to her compliance breaches.

40. On August 12, 2021, Nan Sheng told Feng, in person, that she should not have sent an email to SLT, and Mr. Jiang was not happy about it.

41. On August 16, 2021, Feng was placed on PIP (Performance Improvement Program) for "inappropriately sen[ding] email to leadership group." She complained to Mr. Jiang about the PIP that same day. While Li was put on PIP as well, this was likely done with the intent of masking the major, unresolved compliance issues behind a contrived pretextual conflict between two employees – Feng and Li.

42. The following day, ASC's Chief Medical Officer (who performs some HR functions as well), emailed Feng and Li stating the PIP was on hold. Feng then sent an email to both the Chief Medical Officer and HR, stating: "…I have tried to communicate my concerns in many ways (Lijing, Ruhong, [..], Nan, and others) over several months, and the company failed to stop Lijing's rude behavior and noncompliance activities… all GMP related SOPs are enforceable by gov. agency. It is appropriate to let the senior leader team be aware of the critical concerns, my constructive messages [would] only make the company better in the long term."

43. On August 20, 2021, an external investigator hired by ASC, interviewed Feng regarding her complaints. Feng provided her with examples of non-compliance, lack of proper competence, and hostile working environment at the company.

44. On September 2, 2021, Ms. Sheng emailed Feng to suggest they should review the investigator's report at the office at 11:00 a.m. the following day. On September 3, 2021, Feng met with HR and ASC's Chief Medical Officer. They told her she must accept PIP, or

she would be terminated.  Feng refused to accept PIP and was thus terminated, effective the same day.  Ms. Sheng was the author of the termination letter, which did not cite to any specific reasons for the firing.

## FIRST CAUSE OF ACTION

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### (Against all corporate Defendants)

45. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs, inclusive, and incorporates the same by reference as though fully set forth herein.

46. Plaintiff is informed and believes, and based thereon alleges, that her termination was brought about by the wrongful conduct of Defendants. Such conduct was in violation of the public policy of the State of California as set forth in Labor Code sections 1102.5 and Government Code section 12650 *et seq.*, including Government Code section 12653.

47. As alleged above, ASC terminated Plaintiff's employment, depriving her of its attendant benefits and compensation, immediately in the wake of and because of her complaints about dangerous/defective products that the company was releasing into the commerce stream for human clinical trials.  Plaintiff, in no uncertain words, complained to the company about flaws in its manufacturing process that created a substantial risk to public health and safety, including the threat of infection and even death of patients.

48. The effect of the above-described termination by the company has been to deprive Plaintiff of employment opportunities and to otherwise adversely affect her status as an employee because of her opposition, refusal to engage in and resistance to unlawful conduct.

49. As a proximate result of Plaintiff's termination by Defendants, Plaintiff has suffered and continues to suffer harm, including but not limited to, lost earnings and other employment benefits, loss of future employment benefits, humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount to be proven at trial but exceeding the minimum jurisdictional limits of this Court.

50. In doing the acts herein alleged, Defendants acted with oppression, fraud, malice and in conscious disregard of Plaintiff's rights. Plaintiff is therefore entitled to punitive damages in an amount according to proof at trial.

51. Plaintiff has also incurred and continues to incur attorneys' fees and legal expenses in an amount according to proof at trial.

52. Plaintiff requests relief as described below.

## SECOND CAUSE OF ACTION

## RETALIATION IN VIOLATION OF LABOR CODE § 1102.5

### (Against all corporate Defendants)

53. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs, inclusive, and incorporates the same by reference as though fully set forth herein.

54. During her employment, Plaintiff engaged in the legally protected activity of communicating to her supervisor, other members of upper management, and human resources about unlawful conduct and violations in the manufacturing process that threatened patient health and safety, and resisting, opposing and refusing to engage in the same, as well as a cover-up of the same.

55. Immediately following and in retaliation for the above-described protected activity, ASC terminated Plaintiff's employment effective September 3, 2021.

56. Plaintiff's protected activity was a substantial motivating factor for ASC's termination of her employment and thus constituted unlawful retaliation in violation of California Labor Code section 1102.5(a)-(c).

57. The effect of the above actions and omissions by Defendants has been to deprive Plaintiff of employment opportunities and to otherwise adversely affect her status as an employee because of her opposition and/or resistance to unlawful conduct.

58. As a proximate result of Plaintiff's termination by Defendants, Plaintiff has suffered and continues to suffer harm, including but not limited to, lost earnings and other employment benefits, loss of future employment benefits, humiliation, emotional distress, and

mental pain and anguish, all to her damage in an amount to be proven at trial but exceeding the minimum jurisdictional limits of this Court.

59. In doing the acts herein alleged, Defendants acted with oppression, fraud, malice and in conscious disregard of Plaintiff's rights. Plaintiff is therefore entitled to punitive damages in an amount according to proof at trial.

60. Plaintiff has also incurred and continues to incur attorneys' fees and legal expenses in an amount according to proof at trial.

61. Plaintiff requests relief as described below.

## THIRD CAUSE OF ACTION

## VIOLATION OF 31 U.S.C. § 3730

## FEDERAL FALSE CLAIMS ACT RETALIATION

62. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs, inclusive, and incorporates the same by reference as though fully set forth herein.

63. By virtue of their work, Defendants receive millions of dollars in government funding. Though not all of this is granted to ASC directly, it can be traced to individuals and entities that receive funds to be spent or used on the Government's behalf or to advance a Government program or interest. On information and belief, funds that have been granted to ASC include: at least $3.8 million paid by the National Institutes of Health (NIH) to ASC's parent company, Applied Stemcell, Inc., since 2014, which was at least in part used for funding gene editing technology related to ASC618; $1,525431 from NIH to H. Trent Spencer, Ph.D. and Christopher Doering, whose work on gene therapy for hemophilia using those funds forms the basis of ASC618; and at least $4,072,684 to Spencer and Doering's company Expression Therapeutics, which was used to produce work to which ASC acquired the rights and utilized in developing its projects.

64. As part of certifications that Defendants made and, on information and belief, continue to make, in order to obtain such funding, Defendants represent that their manufacturing processes create drugs that are safely derived from cells, and which can be used to treat intractable diseases and conduct gene/cell therapy in humans. Additionally, on

information and belief, Defendants represented and represent that the company follows current Good Manufacturing Practices (GMPs) and Good Tissue Practices (GTPs) promulgated by the U.S. Food and Drug Administration (FDA), the Compliance Policy Guide, the FDA's Application Integrity Policy, relevant Code of Federal Regulations, and their own internal quality control and safety precautions.  These are all standards designed to protect the public from dangers to consumer/patient health and safety, and consequently are material information.

65. Defendants made these representations despite knowing of the falsity of the statements.

66. Plaintiff's protected activity, as described above, included efforts to stop, complaints about, and refusal to engage in or cover up violations of these standards, and by extension, the false statements submitted to the companies and individuals providing ASC with funding from the government.  These statements are those that ASC used and uses in order to secure substantial funding.

67. Immediately following and in retaliation for her protected activity and efforts to stop what amounts to violations of the Federal False Claims Act, the company terminated Plaintiff's employment.

68. Plaintiff's protected activity was a substantial motivating factor for the company's termination of her employment and thus constituted unlawful retaliation in violation of 31 U.S.C. § 3730.

69. The effect of the above actions and omissions by Defendants has been to deprive Plaintiff of employment opportunities and to otherwise adversely affect her status as an employee because of her opposition and/or resistance to unlawful conduct.

70. As a proximate result of Plaintiff's termination by Defendants, Plaintiff has suffered and continues to suffer harm, including but not limited to, lost earnings and other employment benefits, loss of future employment benefits, humiliation, emotional distress, and mental pain and anguish, all to her damage in an amount to be proven at trial but exceeding the minimum jurisdictional limits of this Court.

71. Plaintiff has also incurred and continues to incur attorneys' fees and legal expenses in an amount according to proof at trial.

72. Plaintiff requests relief as described below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks relief from this Court in the following respects:

1. For special and general damages according to proof;

2. For double damages pursuant to California Government Code section 12653 and 31 U.S.C. § 3730(h);

3. For punitive damages;

4. For a permanent injunction prohibiting Defendants from engaging in violation of relevant provisions of the California Labor Code;

5. For costs of suit incurred herein;

6. For attorneys' fees on causes of action where fees are available by law, including those recoverable pursuant to California Labor Code 1102.5 and 31 U.S.C. § 3730(h);

7. For prejudgment and post-judgment interest as available by law; and

8. For such other and further relief as this Court may deem just and proper.

Dated: January 31, 2022                                Respectfully submitted,

                                                       By: s/ David Markevitch

                                                       David Markevitch
                                                       Affeld Grivakes LLP
                                                       Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for each cause of action on which she is entitled to a jury trial.

Dated: January 31, 2022                              Respectfully submitted,


                                                     By:    s/ David Markevitch

                                                     David Markevitch
                                                     Affeld Grivakes LLP
                                                     Attorney for Plaintiff